RECEIVED

SEP 04 2026

AT 8:30______________M
CLERK, U.S. DISTRICT COURT - DNJ

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES ex rel. 19 CATCH, LLC,<br><br>Plaintiff,<br><br>v.<br><br>**IVI-RMA GLOBAL, S.L.,<br>RMA OF NEW JERSEY LLC,<br>RMANJ MANAGEMENT LLC,<br>RMA PHL MANAGEMENT INC.,<br>RMA OF LEHIGH VALLEY PC,<br>RMA OF FLORIDA LLC,<br>IVI AMERICA, LLC,<br>REPRODUCTIVE MEDICINE ASSOCIATES OF PHILADELPHIA, PC,<br>RMA SOCAL MANAGEMENT LLC,<br>RMA OF NORTHERN CALIFORNIA MANAGEMENT LLC,<br>RMA OF NORTHERN CALIFORNIA PC, and<br>THE FOUNDATION FOR EMBRYONIC COMPETENCE, INC.,**<br><br>Defendants. | Civil Action No. __________<br><br>FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)<br><br>31 U.S.C. § 3729–3733 et seq. |

## FALSE CLAIMS ACT COMPLAINT

19 CATCH, LLC ("Relator") brings this action as a qui tam relator on behalf of the United States against IVI-RMA Global, S.L., RMA of New Jersey LLC, RMANJ Management LLC, RMA PHL Management Inc., RMA of Lehigh Valley PC, RMA of Florida LLC, IVI America, LLC, Reproductive Medicine Associates of Philadelphia, PC, RMA SoCal Management LLC, RMA of Northern California Management LLC, RMA of Northern California PC, and The Foundation for Embryonic Competence, Inc. (collectively, "Defendants"), pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. §§ 3729–3733, to recover damages, penalties, attorney fees and costs, and other relief.

## Introduction

1. The affiliated Defendants IVI-RMA Global, S.L., RMA of New Jersey LLC, RMANJ Management LLC, RMA PHL Management Inc., RMA of Lehigh Valley PC, RMA of Florida LLC, IVI America, LLC, Reproductive Medicine Associates of Philadelphia, PC, RMA SoCal Management LLC, RMA of Northern California Management LLC, RMA of Northern California PC, and The Foundation for Embryonic Competence, Inc. fraudulently obtained a total of $8,676,600.00 in first-draw Paycheck Protection Program ("PPP") loan proceeds, of which SBA forgave, plus stated interest, $8,669,187.00.

2. Together, based on the employee counts reported in the first-draw PPP loan records, the borrowing Defendants reported at least 629 employees. But IVI-RMA Global's own 2019 consolidated reporting disclosed 598 U.S. employees and 2,567 average employees group-wide. The borrowers were required to apply SBA affiliation rules and aggregate the employees and receipts of their common-control enterprise. Their true employee count therefore far exceeded the 500-employee cap for first-draw PPP loans.

3. Upon information and belief, Defendants also did not meet any of the other PPP eligibility criteria for first-draw loans. IVI-RMA Global's consolidated 2019 financial statements reported €204.966 million in consolidated equity, €73.499 million in cash and cash equivalents, and more than €433 million in total assets. The parent company also reported that it had obtained €35.5 million in additional financing lines during February and March 2020. These facts, together with the affiliated enterprise's size and resources, support the inference that Defendants could not qualify under the alternative size standard and lacked an adequate basis for the necessity certifications made in connection with the loans.

4. Had Defendants been candid about their affiliates' employees, receipts, ownership, and control on their PPP loan applications, Defendants would not have received $8,676,600.00 in

PPP proceeds, and United States taxpayers would have avoided $8,669,187.00 in forgiven payments, together with lender processing fees.

5. Relator is an original source of the Complaint allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B). Relator's knowledge is independent of, and materially adds to, any publicly disclosed information concerning the corporate structure and management linking Defendants, the parent's consolidated reporting, the aggregate employee figures, and the resulting size ineligibility. Prior to filing this Complaint, Relator voluntarily disclosed to the Government the facts and evidence underlying these allegations.

6. This action is filed in camera and under seal pursuant to the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2).

## Jurisdiction and Venue

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

8. This Court may exercise personal jurisdiction over Defendants, and venue is appropriate in this Court, under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(2), because Defendants submitted, or caused the submission of, false claims in this District, and a substantial part of the events or omissions giving rise to Relator's claim occurred in this District. Multiple borrowers operated or were managed from Basking Ridge, New Jersey, and the affiliated enterprise's principal U.S. operations were directed from New Jersey.

## The Parties

9. Relator 19 CATCH, LLC ("Relator" or "19 Catch") is a Single-Member Limited Liability Company registered in New Jersey. Relator brings this action based on its direct,

independent, and personal knowledge of the facts, and also upon information and belief. Relator is an original source of this information to the United States.

10. Defendant IVI-RMA Global, S.L. ("IVI-RMA Global") was a Spanish limited-liability company formed in or about 2017 and operating as the dominant parent of a consolidated international fertility-services group. IVI-RMA Global maintained its registered office in Valencia, Spain, and operated and transacted business in this District and elsewhere through its U.S. subsidiaries and affiliates.

11. Defendant RMA of New Jersey LLC ("RMA New Jersey") was a limited liability company operating and transacting business in Basking Ridge, New Jersey within this District and elsewhere.

12. Defendant RMANJ Management LLC ("RMANJ Management") was a limited liability company operating and transacting business in Basking Ridge, New Jersey within this District and elsewhere. IVI-RMA Global's 2019 consolidated reporting indicates that it indirectly owns 85 of RMANJ Management LLC as a U.S. subsidiary.

13. Defendant RMA PHL Management Inc. ("RMA PHL") was a corporation operating and transacting business in Basking Ridge, New Jersey within this District and elsewhere. IVI-RMA Global's 2019 consolidated reporting indicates that it owns 51 percent of RMAPHL Management Inc. as a U.S. subsidiary.

14. Defendant RMA of Lehigh Valley PC ("RMA Lehigh Valley") was a professional corporation operating and transacting business in Morristown, New Jersey within this District and elsewhere.

15. Defendant RMA of Florida LLC ("RMA Florida") was a limited liability company operating and transacting business in Lake Mary, Florida and elsewhere.

16. Defendant IVI America, LLC ("IVI America") was a limited liability company operating and transacting business in Basking Ridge, New Jersey, Los Angeles, California, and elsewhere. IVI-RMA Global's 2019 consolidated reporting indicates that it owns 100% of IVI America LLC as a U.S. subsidiary.

17. Defendant Reproductive Medicine Associates of Philadelphia, PC ("RMA Philadelphia") was a professional corporation operating and transacting business in Willow Grove, Pennsylvania and elsewhere.

18. Defendant RMA SoCal Management LLC ("RMA SoCal") was a limited liability company operating and transacting business in Los Angeles, California and elsewhere.

19. Defendant RMA of Northern California Management LLC ("RMA NorCal Management") was a limited liability company operating and transacting business in San Francisco, California and elsewhere.

20. Defendant RMA of Northern California PC ("RMA NorCal") was a professional corporation operating and transacting business in San Francisco, California and elsewhere.

21. Defendant The Foundation for Embryonic Competence, Inc. ("Foundation") was a nonprofit corporation operating and transacting business in Basking Ridge, New Jersey within this District and elsewhere. Upon information and belief, the Foundation performed embryo genetic testing for the affiliated enterprise's patients and was subject to common control or management with the affiliated enterprise.

22. Defendants IVI-RMA Global, RMA New Jersey, RMANJ Management, RMA PHL, RMA Lehigh Valley, RMA Florida, IVI America, RMA Philadelphia, RMA SoCal, RMA NorCal Management, RMA NorCal, and the Foundation are collectively referred to herein as the "IVI-RMA Entities."

23. Peapack-Gladstone Bank is the financial institution that processed all of the PPP loans submitted by the Defendants.

## Legal Background

### A. The False Claims Act

24. The False Claims Act provides, in pertinent part, that any person who:

> 25. (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

26. 31 U.S.C. § 3729(a)(1).

27. For purposes of the False Claims Act, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information[,] (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

### B. The Paycheck Protection Program

28. In March 2020, through the CARES Act, Pub. L. 116–136, Congress established the PPP to provide economic relief for small businesses during the coronavirus pandemic.

29. Under the first round of the PPP, an eligible business could apply for a loan of up to 2.5 times its average monthly payroll, with a maximum $100,000 annual salary per employee, during the one-year period before the date on which the loan was made, subject to a maximum

amount of $10 million. See 15 U.S.C. § 636(a)(36)(E); see also Small Business Administration ("SBA") Form 2483, Instructions.

30. An applicant for a first-draw PPP loan could qualify as an eligible business under any of three standards:

(1) having an average of no more than 500 employees during 2019 or during the 12 months prior to applying for a first-draw PPP loan, see 15 U.S.C. § 636(a)(36)(D)(i)(I) and SBA, PPP Loans Frequently Asked Questions, Question 14 (April 6, 2020);

(2) the SBA employee-based or revenue-based size standard corresponding to the business's primary industry, see 15 U.S.C. § 636(a)(36)(D)(i)(II) and SBA, PPP Loans Frequently Asked Questions, Question 2; or

(3) the SBA's alternative size standard, which provided that the business must have (a) a maximum tangible net worth of not more than $15 million, and (b) average net income after tax of not more than $5 million for the business's two full preceding fiscal years as of March 27, 2020, see 86 Fed. Reg. 15083, 15085 n.5 (Mar. 22, 2021) and SBA, PPP Loans Frequently Asked Questions, Question 2.

31. Under each of these eligibility standards, the law required the business to include its affiliates in assessing whether the business met the standard. See 15 U.S.C. § 636(a)(36)(D)(iv). The affiliation rule in effect at the time provided that "concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both." 13 C.F.R. § 121.301(f) (2019).

32. Affiliation based on ownership arises where an individual, concern, or entity owns or has the power to control more than 50 percent of the concern's voting equity. Affiliation based on management arises where the CEO, President, officers, managing members, or partners who control the management of the applicant concern also control the management of one or more other concerns, including through a management agreement. See id.

33. The PPP statute waived the affiliation rules for certain hotels and food-service businesses. Specifically, the PPP statute provided that the SBA affiliation rule was waived for "any business concern with not more than 500 employees that, as of the date on which the covered loan

is disbursed, is assigned a North American Industry Classification System ["NAICS"] code beginning with 72." 15 U.S.C. § 636(a)(36)(D)(iv). No Defendant pleaded herein operated as a hotel or food-service business or otherwise qualified for that waiver.

34. In guidance issued on April 6, 2020, SBA stated that borrowers were required to apply SBA's affiliation rules. A borrower had to certify that it was eligible to receive a PPP loan, and that certification meant that it was a small business concern, met the applicable SBA employee-based or revenue-based size standard, or met the alternative size standard, after applying the affiliation rules, if applicable. SBA, PPP Loans Frequently Asked Questions, Question 5 (Apr. 6, 2020).

35. To apply for a first-draw PPP loan, a business submitted an SBA Form 2483 to an authorized lender. The application form required a potential borrower to specify, among other things, the number of employees and whether "the Applicant or any owner of the Applicant [is] an owner of any other business, or have common management with, any other business." The form further required the applicant to certify, among other things, that "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted," and that the applicant employed no more than the greater of 500 employees or, if applicable, the size standard in number of employees established by SBA for the applicant's industry.

36. The PPP allowed full loan forgiveness if borrowers used loan proceeds as required by PPP rules and maintained their employee headcount. See 15 U.S.C. § 636m; SBA, Frequently Asked Questions (FAQs) on PPP Loan Forgiveness (Oct. 13, 2020). A borrower that sought forgiveness necessarily submitted or caused the submission of a forgiveness application and supporting certifications to SBA through its lender.

**Background on Defendants' PPP Loans**

37. On April 9, 2020, SBA approved a first-draw loan to RMA New Jersey in the amount of $2,210,900.00 through Peapack-Gladstone Bank. On the application form for this loan, according to SBA data, RMA New Jersey represented that it had 97 employees. A review of public SBA records reflects that the loan was fully disbursed; the loan record does not disclose a forgiveness date or amount. SBA paid the loan processor 1 percent of the loan amount, or $22,109.00.

38. On April 10, 2020, SBA approved a first-draw loan to RMANJ Management in the amount of $3,740,200.00 through Peapack-Gladstone Bank. On the application form for this loan, according to SBA data, RMANJ Management represented that it had 347 employees. A review of public SBA records reflects that the loan was fully disbursed; the loan record does not disclose a forgiveness date or amount. SBA paid the loan processor 1 percent of the loan amount, or $37,402.00.

39. On April 11, 2020, SBA approved a first-draw loan to RMA PHL in the amount of $683,200.00 through Peapack-Gladstone Bank. On the application form for this loan, according to SBA data, RMA PHL represented that it had 53 employees. A review of public SBA records reflects that the loan was fully disbursed; the loan record does not disclose a forgiveness date or amount. SBA paid the loan processor 1 percent of the loan amount, or $6,832.00.

40. On April 10, 2020, SBA approved a first-draw loan to RMA Lehigh Valley in the amount of $136,000.00 through Peapack-Gladstone Bank. On the application form for this loan, according to SBA data, RMA Lehigh Valley represented that it had 7 employees. A review of public SBA records reflects that the loan was fully disbursed; the loan record does not disclose a forgiveness date or amount. SBA paid the loan processor 1 percent of the loan amount, or $1,360.00.

41. On April 9, 2020, SBA approved a first-draw loan to RMA Florida in the amount of $142,000.00 through Peapack-Gladstone Bank. On the application form for this loan, according to SBA data, RMA Florida represented that it had 15 employees. A review of public SBA records reflects that the loan was fully disbursed; the loan record does not disclose a forgiveness date or amount. SBA paid the loan processor 1 percent of the loan amount, or $1,420.00.

42. On April 10, 2020, SBA approved a first-draw loan to IVI America's Basking Ridge, New Jersey location in the amount of $521,100.00 through Peapack-Gladstone Bank. On the application form for this loan, according to SBA data, IVI America represented that it had 34 employees. A review of public SBA records reflects that the loan was fully disbursed; the loan record does not disclose a forgiveness date or amount. SBA paid the loan processor 1 percent of the loan amount, or $5,211.00.

43. On April 11, 2020, SBA approved a first-draw loan to RMA Philadelphia in the amount of $434,100.00 through Peapack-Gladstone Bank. On the application form for this loan, according to SBA data, RMA Philadelphia represented that it had 21 employees. A review of public SBA records reflects that the loan was fully disbursed; the loan record does not disclose a forgiveness date or amount. SBA paid the loan processor 1 percent of the loan amount, or $4,341.00.

44. On April 9, 2020, SBA approved a first-draw loan to RMA SoCal in the amount of $77,900.00 through Peapack-Gladstone Bank. On the application form for this loan, according to SBA data, RMA SoCal represented that it had 5 employees. On April 15, 2021, SBA forgave $63,904.00 of the loan. SBA paid the loan processor 1 percent of the loan amount, or $779.00.

45. On April 9, 2020, SBA approved a first-draw loan to RMA NorCal Management in the amount of $168,400.00 through Peapack-Gladstone Bank. On the application form for this

loan, according to SBA data, RMA NorCal Management represented that it had 13 employees. On March 29, 2021, SBA forgave $169,996.00, including stated interest. SBA paid the loan processor 1 percent of the loan amount, or $1,684.00.

46. On April 9, 2020, SBA approved a first-draw loan to RMA NorCal in the amount of $82,000.00 through Peapack-Gladstone Bank. On the application form for this loan, according to SBA data, RMA NorCal represented that it had 7 employees. On March 17, 2021, SBA forgave $82,755.00, including stated interest. SBA paid the loan processor 1 percent of the loan amount, or $820.00.

47. On April 9, 2020, SBA approved a separate first-draw loan to IVI America's Los Angeles, California location in the amount of $98,800.00 through Peapack-Gladstone Bank. The record reported 4 employees. On April 15, 2021, SBA forgave $99,788.00, including stated interest. SBA paid the loan processor 1 percent of the loan amount, or $988.00.

48. On April 27, 2020, SBA approved a first-draw loan to the Foundation in the amount of $382,000.00 through Peapack-Gladstone Bank. On the application form for this loan, according to SBA data, the Foundation represented that it had 26 employees. On March 5, 2021, SBA forgave $385,244.00, including stated interest. SBA paid the loan processor 1 percent of the loan amount, or $3,820.00.

49. The related-company records identify the borrowers' NAICS classifications as follows: 621410 (Family Planning Centers) for RMA New Jersey, RMA Lehigh Valley, RMA Florida, the Somerset IVI America record, and RMA Philadelphia; 531120 (Lessors of Nonresidential Buildings, except Miniwarehouses) for RMANJ Management; 621111 (Offices of Physicians, except Mental Health Specialists) for RMA PHL, the Los Angeles IVI America record, RMA SoCal, RMA NorCal, and the Foundation; and 561110 (Office Administrative Services) for

RMA NorCal Management. None of these classifications begins with NAICS code 72 or otherwise supports the PPP's hotel-and-food-services affiliation waiver.

50. Collectively, Defendants received $8,676,600.00 in first-draw PPP loan proceeds. Based on the forgiveness amounts presently identified in SBA data, SBA forgave, plus stated interest, $8,669,187.00 of those loans and paid at least $86,766.00 in lender processing fees. For several borrowers, the available loan records reflect full disbursement but do not disclose individual forgiveness dates or amounts.

## Fraud Allegations

### A. The Defendants Were Affiliates Of One Another

51. The IVI-RMA Entities were affiliates of one another because, at all times relevant to this Complaint, they operated as a highly integrated, parent-controlled fertility-services enterprise. IVI-RMA Global was the dominant parent of a consolidated group that included numerous U.S. and international operating, management, and clinical entities.

52. IVI-RMA Global's own 2019 consolidated reporting identifies IVI America LLC as a direct 100-percent-owned U.S. subsidiary; RMANJ Management LLC as an indirectly held 85-percent-owned U.S. subsidiary; and RMAPHL Management Inc. as a direct 51-percent-owned U.S. subsidiary. The same reporting identifies a network of related U.S. RMA management and clinical entities. These ownership interests establish IVI-RMA Global's power to control the borrowers directly or through controlled intermediaries.

53. The parent's 2019 non-financial statement reported 598 employees in the United States as of December 31, 2019, before aggregating foreign affiliates and the managed physician practices. Its consolidated financial statements further reported an average of 2,567 employees in 2019, excluding employees of one identified Middle East subgroup. Those contemporaneous

figures confirm that the IVI-RMA enterprise materially exceeded the applicable PPP employee threshold.

54. Upon information and belief, the borrowers also operated under centralized ownership, management, payroll, human-resources, clinical, and administrative functions. The shared RMA and IVI branding; common U.S. management locations; overlapping management-company and physician-practice structures; and parent-level consolidation corroborate common control and required the borrowers to aggregate affiliate employees and receipts when determining PPP eligibility.

55. The Foundation also was an affiliate of the IVI-RMA enterprise, or was otherwise controlled or managed in common with the enterprise, because it performed embryo genetic testing for RMA patients and operated within the same affiliated fertility-services network. At a minimum, the Foundation's April 27, 2020 PPP application required a truthful disclosure and application of the affiliation rules based on its ownership, management, and operational relationships.

56. Ownership or control of more than fifty percent of an entity's voting equity establishes the power to control regardless of whether that power was actually exercised. Accordingly, each borrower was required to include the employees and receipts of its controlled affiliates. By reporting only its stand-alone employees, or otherwise failing to disclose the full affiliated enterprise, each borrower understated the size of the affiliated enterprise and falsely certified that it satisfied the applicable PPP size standard.

**B. The Defendants Did Not Qualify For Their PPP Loans Under Any Of The Applicable Eligibility Standards.**

57. Defendants did not qualify for their first-draw PPP loans under the generally applicable 500-employee standard and, upon information and belief, did not qualify under the applicable industry receipts or employee standards or the alternative size standard.

58. First, the employee counts reported in Defendants' first-draw PPP loan records total at least 629 employees. Because the borrowers were affiliates and no pleaded borrower qualified for a statutory affiliation waiver, their employees were required to be aggregated. Consequently, the borrowers did not qualify under the generally applicable 500-employee standard. IVI-RMA Global's own 2019 reporting of 598 U.S. employees independently corroborates that the affiliated U.S. enterprise materially exceeded that threshold.

59. Second, upon information and belief, Defendants together had far more in annual revenue than the highest revenue-based standard associated with any of the Defendants' applicable NAICS codes when they applied for their first-draw PPP loans. The related-company records consistently identify estimated annual net revenue of $301,000,000 for the affiliated enterprise. That figure, together with the enterprise's parent-level consolidation, international fertility-clinic operations, and publicly reported scale, supports the inference that the affiliated enterprise exceeded the receipts-based size standards applicable to the borrowers.

60. Third, upon information and belief, Defendants together had far more than $15 million in tangible net worth. The related-company records consistently identify company net worth of $30,400,000 for the affiliated enterprise. The parent's 2019 consolidated financial statements further reported €204.966 million in consolidated equity, €433.567 million in total assets, and €73.499 million in cash and cash equivalents. Although the alternative-size calculation requires a borrower-specific determination under SBA rules, these reported figures support the inference that the affiliated enterprise could not satisfy that standard.

61. Fourth, Defendants lacked an adequate basis for their certifications that current economic uncertainty made the loan requests necessary to support ongoing operations. The consolidated accounts acknowledge pandemic-related operational uncertainty but also report that

the group had cash resources, secured €35.5 million in additional financing lines in February and March 2020, and received a significant cash inflow in 2020 from a January sale of an interest in a subsidiary. The necessity certification was an independent requirement, separate from size eligibility.

62. Finally, the Foundation's forgiveness on March 5, 2021 predated the American Rescue Plan Act's March 11, 2021 amendment to the employee test for certain 501(c)(3) organizations. Upon information and belief, the Foundation therefore could not invoke subsequent SBA forgiveness guidance applicable to qualifying forgiveness applications submitted on or after March 11, 2021 to cure an otherwise disqualifying employee aggregation.

**COUNT I**

**False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**(False Claim)**

63. Relator re-alleges and incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

64. Through the acts set forth above, before at least or on or about April 9, 2020, through at least on or about April 15, 2021, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to SBA for their first-draw PPP loans and loan forgiveness to which they were not entitled.

65. By virtue of the false or fraudulent claims that Defendants knowingly made or presented, or caused to be made or presented, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**COUNT II**

**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**(False Records)**

66. Relator re-alleges and incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

67. Through the acts set forth above, before at least or on or about April 9, 2020, through at least on or about April 15, 2021, Defendants knowingly made, used, or caused to be made and used, false records and statements material to the payment of false or fraudulent claims by SBA for their first-draw PPP loans and loan forgiveness to which they were not entitled.

68. By virtue of the false records and statements Defendants made, used, or caused to be made or used, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), and the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**COUNT III**

**False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**
**(Reverse False Claims)**

69. Relator re-alleges and incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

70. Through the acts set forth above, before at least or on or about April 9, 2020, through at least on or about April 15, 2021, Defendants knowingly made, used, or caused to be made or used, false records or statements material to obligations to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased obligations to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

71. By virtue of the false or fraudulent claims that Defendants knowingly made or presented, or caused to be made or presented, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), and the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**Prayer for Relief**

WHEREFORE, Relator demands and prays for the following relief:

72. That judgment be entered in favor of the United States for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

73. An award to Relator of a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730(d);

74. An award to Relator of its costs and reasonable attorney fees for prosecuting this action; and

75. All other relief as may be required or authorized by law and in the interests of justice.

Dated: September 4, 2026

Respectfully submitted,

19 CATCH, LLC

By its attorney,

Peter Katz, Esq.
Law Offices of Peter Katz, LLC
5 Vaughn Drive, Suite 308
Princeton, New Jersey 08540
peter@pkatzlegal.com
(609) 244-0500